**EXHIBIT 4**

State of Maine
Kennebec, ss

Superior Court
Civil Action
Docket No.: CV-23-35

Brenda A. Gowesky,

      Plaintiff,

    v.

State of Maine, Maine Board Of
Licensure in Medicine,

and

Dennis E. Smith,

      Defendants.

### Civil-Rights Complaint for Unlawful Retaliation Based on Activities Protected by State and Federal Employment Rights Laws

Dr. Brenda A. Gowesky brings this action against the State of Maine, Maine Board of Licensure in Medicine ("the Board") and its Executive Director Dennis E. Smith and states as follows:

### Summary

1.    Dr. Gowesky is a board-certified emergency medicine physician with 30 years of experience in emergency room medicine and 26 years of supervisory experience.



2.      On October 15, 2019, Dr. Gowesky began working at the Board as its new Medical Director. On January 13, 2020, Dr. Gowesky asked Mr. Smith about her three-month performance evaluation. He told Dr. Gowesky that he was going to do it "this week" and not to worry because the evaluation would be "good." As of January 13, 2020, Dr. Gowesky had received no feedback that her performance was unsatisfactory, and her personnel file did not contain an iota of negative feedback.

3.      When she began working for the Board, Dr. Gowesky was pursuing an employment discrimination complaint against her former employer, Northern Light Eastern Maine Medical Center (NL EMMC) and its parent company, Northern Light Health (NLH). She had filed complaints with the Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC). Her complaint alleged that NL EMMC and NLH had terminated her in retaliation for (1) her whistleblowing about very unsafe conditions in the NL EMMC emergency department, leading to at least one death, and (2) her internal complaint about whistleblowing retaliation and age and sex discrimination; and because of age and sex discrimination.

4.      On January 15, 2020, an attorney for NLH contacted the Board and objected to Dr. Gowesky's participation in any Board proceedings involving employees of NLH or any associated hospitals because Dr. Gowesky

had filed an MHRC complaint and had a "lawsuit" against NLH. NLH then sent multiple follow-up letters to Mr. Smith, objecting to Dr. Gowesky playing any role "when it comes to providers in the NLH system" while "this claim is ongoing."

5.    Mr. Smith told Dr. Gowesky that she seemed "spread thin" by the case against NLH and that he thought the "issue with Northern Light" was "taking up a lot of [her] attention and emotional energy." Mr. Smith also, for the first time, criticized Dr. Gowesky as having a "negative attitude" and not being a "team player."

6.    A little over a month after NLH unfairly accused Dr. Gowesky of bias against all NLH providers based on her MHRC Complaint, Mr. Smith retaliated against Dr. Gowesky by springing on her an unsatisfactory performance evaluation. This was the first time Dr. Gowesky was advised of any job-related performance problems in writing. Mr. Smith then decided to terminate her just four working days later.

7.    Mr. Smith's decision to give Dr. Gowesky a negative performance evaluation in February 2020 departed from the Board's Human Resources procedures, which required continual feedback and prompt written notice of performance problems. His termination decision also directly contradicted instructions from the Human Resources Director to wait at least three more months before making a decision about termination, and in the meantime to

3

hold regular meetings with Dr. Gowesky for the purpose of "go[ing] over areas where she needs to improve" and "trying to get her to the level [he] need[ed] her to be at."

8.  As a result of this unlawfully retaliatory conduct, Dr. Gowesky is seeking all available remedies, including declaratory and injunctive relief, back and front pay and benefits, compensatory and punitive damages, and attorney's fees and expenses.

## The Parties

9.  Plaintiff, Brenda A. Gowesky, was a resident of Camden, Knox County, Maine throughout her employment with the Board. She now resides in Alexandria, Virginia.

10.  Defendant, State of Maine, Maine Board of Licensure in Medicine, is a department of the Maine state government which operates out of Augusta, Kennebec County, Maine.

11.  Defendant Dennis E. Smith is the Executive Director of the Maine Board of Licensure in Medicine. He is being sued solely in his personal and individual capacity and not in his official capacity.

## Jury Trial Demand

12.  Under Me. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable to a jury.

4

## Civil Rights Statutes

13.    This action arises under 42 U.S.C. § 1983; Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17 (Title VII); the Maine Human

Rights Act, 5 M.R.S. §§ 4551-4634 (MHRA), and the Maine Whistleblowers'

Protection Act, 26 M.R.S. § 831-840 (MWPA).

## Venue

14.    Under 14 M.R.S.A. § 501, venue is proper in Kennebec County

"where the cause of action took place."

## Facts

15.    Dr. Gowesky is a board-certified emergency medicine physician

with 30 years of experience in emergency room medicine and 26 years of

supervisory experience. She served for about 10 years as the Chief, Lead

Physician, and Medical Director for the Emergency Department at NL

EMMC.

16.    In May 2017, Dr. Gowesky was terminated by two top leaders of

NLH, including its Chief Legal Counsel, Glenn Martin, and its Chief Human

Resources Officer, Paul Bolin.

17.    In January 2018, Dr. Gowesky filed an MHRC complaint against

NL EMMC and NLH alleging that she was unlawfully terminated because of

her whistleblowing reports about very unsafe conditions in EMMC's

5

Emergency Room, leading to at least one patient death, because of her internal complaints about whistleblower retaliation and age and sex discrimination, and because of her age and sex.

18.    In November 2018, Dr. Gowesky applied for a vacant physician position on the Medical Board. During her job interview on November 29, Mr. Smith was initially enthusiastic and complimentary about her experience and qualifications, but when he found out that she was pursuing legal claims against her prior employer, NL EMMC, he soured on the application. He suggested that Dr. Gowesky apply instead for the Medical Director position because it would not require her to take an oath of office.

19.    Eventually, Dr. Gowesky did apply for the Medical Director opening and Mr. Smith hired her, but only after hesitating and pressing her and her references to confirm that she was a "team player." One of the references reported that it was very obvious that Mr. Smith was focused on Dr. Gowesky's ability to get along with others in the office.

20.    Dr. Gowesky began working as the Medical Director for the Board on October 15, 2019.

21.    Dr. Gowesky initially received positive feedback on her work from Mr. Smith. For example, on December 5, 2019, he wrote "Great job!" in response to her draft assessment and direction ("A&D") summary, and on

December 23, 2019, he wrote "Excellent job, Brenda" in response to another document prepared by Dr. Gowesky.

22.     Julie Best, the Board's Complaint Coordinator, also told Dr. Gowesky that she was doing a great job in December 2019.

23.     On December 24, 2019, Mr. Smith handed Dr. Gowesky a Christmas card in the office and told her that he was very pleased with her work.

24.     From November through early January, Dr. Gowesky received positive feedback from several members of the Board about her work, and Assistant Attorney General Michael Miller also told her that she was doing well and learning quickly.

25.     On January 13, 2020, Dr. Gowesky asked Mr. Smith when she could expect to receive her three-month performance evaluation, as January 15 was three months from her start date. He told Dr. Gowesky that he was going to do it "this week" and not to worry because the evaluation would be "good."

26.     On January 15, 2020, at about 10:30 am, Dr. Gowesky was called into Mr. Smith's office for a meeting with Mr. Smith and Ms. Miller. Mr. Smith told Dr. Gowesky that he had received an email from an attorney for NLH, Sandy Rothera. In the email, Ms. Rothera stated that she wanted to speak with Mr. Smith and Ms. Miller before Dr. Gowesky conducted an

7

interview with an employee at an NLH hospital, which Dr. Gowesky had tried to schedule for that day at noon. Mr. Smith dialed Ms. Rothera and stated that he, Ms. Miller, and Dr. Gowesky were in the room for the call. Ms. Rothera said she only wanted to speak with Mr. Smith and Ms. Miller, so Dr. Gowesky left the room and was not on the call.

27.     Mr. Smith and Ms. Miller later recounted the call to Dr. Gowesky as follows: Ms. Rothera said that she was representing NLH; that she had spoken with Jeanine Racquet, Esq., at NLH about Dr. Gowesky; and that she and Ms. Racquet did not want Dr. Gowesky involved in any investigations, reviews, or anything connected with NL EMMC or any other hospitals or providers affiliated with NLH. Mr. Smith and Ms. Miller responded that Ms. Rothera's request was unacceptable and that they disagreed with the request, and Ms. Miller told Ms. Rothera to put NLH's request in writing and send it to her within a few days.

28.     Ms. Miller also informed Dr. Gowesky that during the call, Ms. Rothera had referred to a lawsuit filed by Dr. Gowesky against NLH. Ms. Miller told Dr. Gowesky she wanted to know more about the lawsuit. Dr. Gowesky told Ms. Miller that she had filed an MHRC complaint, not a lawsuit, and that a mediation had been scheduled in the matter. Ms. Miller replied that that was not how Ms. Rothera had represented it. She further

explained that if Dr. Gowesky had to go to court about this, or if there was a hearing, she would need to know why Dr. Gowesky was fired.

29.     Dr. Gowesky then provided Ms. Miller with a brief summary of the MHRC complaint, including that she had reported serious concerns about patient safety in the emergency department and that she was fired in retaliation for the reports. Ms. Miller told Dr. Gowesky that she should tell her attorney about Ms. Rothera's recent call and NLH's request because it seemed like further retaliation. Ms. Miller assured Dr. Gowesky that she would provide her with a copy of the letter from Ms. Rothera once she received it.

30.     Both Ms. Miller and Mr. Smith assured Dr. Gowesky that everything was fine, she was doing well at her job, and her job was not in jeopardy.

31.     The next day, January 16, 2020, Dr. Gowesky asked Mr. Smith about getting an evaluation or something from him saying she was doing a good job and getting along with everyone. Dr. Gowesky told him that her attorney in her case against NLH had asked her to get this information for the upcoming mediation. Mr. Smith responded that he did not feel comfortable giving her anything that would be shown to NL EMMC given his role. He said that she was doing a great job and they wanted to keep her, and

that she got on well with everyone, but he thought things should be kept separate.

32.     Mr. Smith and Ms. Miller then received a letter dated January 17 from NLH requesting that the Board recuse Dr. Gowesky from "participation in and review of any Northern Light Practitioners."

33.     The letter stated in part:

> As discussed, Dr. Gowesky has filed a complaint against NL EMMC and NLH with the Maine Human Rights Commission. She has also served notice of her intent to file suit against NLH and NL EMMC in federal court. That suit is on hold while the parties mediate this matter.

The letter went on to state in part:

> Dr. Gowesky could have elected to file a claim only against NL EMMC, but she chose to involve the entire system. Had she only chosen to file a claim against NL EMMC, NLH would only have concerns about her review and participation in any matters relating to NL EMMC, but that is not the case. Given that she has intentionally filed a claim against NLH and NL EMMC, NLH has lost confidence in Dr. Gowesky's ability to be fair, objective and unbiased when it comes to providers in the NLH system. . . . NLH strongly feels that Dr. Gowesky cannot be anything but biased in her role when it comes to NLH and its system providers, especially while this claim is ongoing.

34.     After receiving the January 17 letter from NLH, Mr. Smith began to treat Dr. Gowesky worse and to criticize her work.

35.     On January 23, the mediation in Dr. Gowesky's case against NL EMMC and NLH was held. During the mediation, they discussed NLH

sending a letter to the Board rescinding its request that Dr. Gowesky be recused from NLH cases and its statement suggesting she was biased.

36.     The next day, Dr. Gowesky told Mr. Smith and Ms. Miller that she had requested that NLH send a letter to them withdrawing its recusal request.

37.     Dr. Gowesky also sent a follow-up email to an NLH hospital to reschedule the interview that had been delayed by NLH's initial objection to her involvement in its matters before the Board. This interview was a routine last step before a case could be closed.

38.     NLH reacted to Dr. Gowesky's scheduling email by sending an email to the Board on January 28, 2020, reiterating that NLH "objects to the participation of Dr. Gowesky in any interviews of any staff of any of their associated hospitals."

39.     When Dr. Gowesky was told about the January 28 email from NLH, she asked Mr. Smith several times for a copy of it, but he declined to give it to Dr. Gowesky.

40.     Mr. Smith and Ms. Miller directed Dr. Gowesky not to conduct the final interview. The interview was reassigned to Ms. Best, the Board's Complaint Coordinator, so the case could be finished without further conflict with NLH.

11

41.    Dr. Gowesky took a scheduled vacation between February 3 and February 10.

42.    When Dr. Gowesky returned from vacation on February 10, she noticed that both Mr. Smith and Ms. Miller acted distant towards her.

43.    Ms. Miller told Dr. Gowesky that she had called and had "a long conversation" with Ms. Rothera. Ms. Miller did not volunteer what the conversation was about, but Dr. Gowesky took her to mean that she discussed NLH's recusal request.

44.    Then, when Dr. Gowesky brought up a case involving an NLH physician to Mr. Smith, he snatched the case file from her and said, "give it to me." He said something along the lines of "we don't need that right now."

45.    On February 19, 2020, Dr. Gowesky went into Mr. Smith's office to ask him if he had any questions about some A&D files he had taken over from her.

46.    Mr. Smith responded that Dr. Gowesky needed to think about whether the job was right for her because it did not seem like a good fit. He said, "this is not working," and that he wanted to meet with Dr. Gowesky the next day. He encouraged her to think about what he had said and stated that he would "need an answer" from her. He provided no specific information about why he believed "this is not working."

47.     Dr. Gowesky was surprised by Mr. Smith's comments. Before NLH started contacting the Board about her, Mr. Smith had consistently given her positive feedback, and no one had indicated that her work was unsatisfactory or that there were concerns about her job performance.

48.     On Thursday, February 20, 2020, Dr. Gowesky met with Mr. Smith and Assistant Executive Director Tim Terranova. During the first part of the meeting, Mr. Smith made numerous harsh statements strongly suggesting that he wanted Dr. Gowesky to resign, including that she needed to understand that "this job is not for everyone," that she was not meeting standards and he was required by law to give her written notification, and that "this is not working out."

49.     Dr. Gowesky asked Mr. Smith how much this had to do with the letters from NLH. Mr. Smith responded by raising his voice and becoming angry.

50.     Mr. Smith then handed Dr. Gowesky her "3 Month Probation Report," even though more than four months had passed since she started working at the Board on October 15, 2019.

51.     The "3 Month" Report was seven pages long and contained numerous criticisms of Dr. Gowesky's job performance, particularly in the areas of writing and organization. .

52.   This meeting was the first time Dr. Gowesky had heard about these criticisms or any other particular concerns about her job performance.

53.   The "3 Month" Report itself acknowledged that Dr. Gowesky had not been "advised of any job-related performance problems in writing," even though such prior notice was "[r]ecommended."

54.   Mr. Smith's failure to give Dr. Gowesky any prior notice of performance problems before the "3 Month Report" was a substantial deviation from the standard procedures in the Board's employee handbook, which instructs that "[t]here should never be any surprises at the end of a performance rating period as managers provide continual feedback, both formally and informally, throughout the rating period."

55.   It was clear that the "3 Month Report" was hastily thrown together in an effort to paper Dr. Gowesky's file with negative comments and to provoke her to resign. The Report contained numerous typographical errors and inaccurately listed January 15, 2020, as the date of the Report. Several of the examples of allegedly poor performance listed in the Report were all suspiciously recent, and the Report appeared to focus on two challenging days rather than holistically and honestly reviewing the entire period of Dr. Gowesky's employment.

56.   Several of the criticisms in the "3 Month Report" were illogical and not fairly attributable to Dr. Gowesky because they directly resulted

from the Board's exclusion of Dr. Gowesky from an important listserv, failure to train Dr. Gowesky adequately on Board procedures, and failure to train Dr. Gowesky on the version of Adobe that was installed on her computer, which she needed to use for bookmarking, one of her key job duties.

57.     During the February 20 meeting, Dr. Gowesky responded that she was surprised by the feedback and asked for some specific examples of poor writing and disorganization.

58.     Mr. Smith cited an A&D memo that she had recently worked on. Mr. Smith had proposed edits to the document and given it to Dr. Gowesky for review and implementation. Dr. Gowesky shared the edited document with Ms. Miller, in accordance with a new office protocol. Ms. Miller then substantially rewrote portions of the document that Mr. Smith had edited. When Mr. Smith criticized Dr. Gowesky for these changes during the February 20 meeting, Dr. Gowesky tried to explain that the heavily edited memo did not reflect her writing.

59.     After the February 20 meeting, Mr. Smith changed the date on the "3 Month Report" from January 15 to February 20, 2020. Sometime thereafter, that date was crossed out and changed again to February 11, 2020.

60.     After the February 20 meeting, Mr. Smith shared the Report with Susan Bell, Human Resources Director.

61.    Ms. Bell responded, in part:

If you were to decide to not keep her – then you should really
complete the 6 month appraisal form before that – I would say by
the end of May.
If [sic] may be good to now have her meet with yourself or Tim
[Terranova] to go over areas where she needs to improve each
week. Let her know you will meet
For the two of you to go over her task and for her to let you know
where she is as well. I would put it on the calendar as a reoccurring
meeting
Like every other week at least.. [sic] This way you are trying to get
her to the level you need her to be at. Let me know if you need
anything.

62.    After being presented with the "3 Month Report," Dr. Gowesky

immediately began working hard to address the concerns stated in the

performance evaluation, including the following: reorganizing the A&D files

in the manner that Mr. Smith requested; attending two trainings; emailing

Mr. Smith and Ms. Best before requesting information to make sure the

information was needed; not working on holidays; completing bookmarking

all the complaint files; and proactively checking in regularly with her team to

make sure there were no concerns about her performance.

63.    While undertaking these good faith efforts to respond to the

feedback in the "3 Month Report," Dr. Gowesky observed that Mr. Smith was

engaging in heightened and disproportionate surveillance of her work

product, keeping track of every little mistake or omission that she made in

the bookmarked files and going out of his way to find alleged "errors" in her work, no matter how minor or immaterial.

64.     On February 26, 2020, Dr. Gowesky received additional training from Mr. Smith regarding A&Ds. Right before the training, Ms. Best told her that her bookmarking was "looking great."

65.     On Monday, March 2, Dr. Gowesky submitted a response to the February 20 performance evaluation. She reiterated her surprise at the severity of the first-time negative feedback and noted that she was disappointed Mr. Smith and Mr. Terranova had not discussed their performance concerns with her sooner. Dr. Gowesky outlined a number of steps that she would take to address their concerns, particularly those about organizing A&D files and managing subpoenas.

66.     In her March 2 response, Dr. Gowesky also identified some obviously unfair criticisms, including for "writing" the A&D summary that had in fact been rewritten by Ms. Miller; for requesting a supposedly unnecessary document that she reasonably—and correctly—believed was critical for answering the patient's allegations; and for working on a holiday, which she had done to make up for time taken off during that same week to care for her mother, who was then 94 years old and recently diagnosed with terminal cancer. Dr. Gowesky concluded by stating, "I want to do a good job

as medical director for the Board of Licensure in Medicine and look forward to working with you."

67.     That same morning, Dr. Gowesky asked Mr. Terranova how she should document on her timesheet a meeting with a union representative, which was scheduled for the following day.

68.     Mr. Terranova initially said that Dr. Gowesky could go to the meeting with the union as part of her regular day without documenting it on the timesheet, but then came back later after having talked to Mr. Smith to tell her that she could not be part of the union as a probationary employee.

69.     Dr. Gowesky ended up meeting with the union representative anyway and joining the union because the union could provide her advice even though it could not file a grievance for her.

70.     After hearing that Dr. Gowesky was going to meet with a union representative, Mr. Smith sent an email on March 2 at 8:56 a.m. to Human Resources, stating: "Tim has indicated that Brenda will be meeting with union reps this week. Can we talk? This is getting toxic."

71.     Mr. Smith followed up a few hours later on March 2 with a second email to Human Resources stating, "We would like to proceed to termination as soon as possible." He attached to this email a memo to Human Resources indicating that he thought the "issue with Northern Light" was "taking up a lot of [Dr. Gowesky's] attention and emotional energy," and

18

stating that "unless Dr. Gowesky's performance **and—more importantly—her attitude** changes for the positive, she will be unable to remain a member of the Board's staff." (emphasis added.)

72.     Mr. Smith decided to fire Dr. Gowesky on Monday, March 2, after only four workdays following the Thursday, February 20 evaluation, and contrary to the advice of the Human Resources Director.

73.     On March 5, 2020, Mr. Smith told Dr. Gowesky he was terminating her employment, explaining that she was "not being a team player" while leaning over his desk toward her.

74.     Mr. Smith's written notice of his termination decision listed a different reason for firing Dr. Gowesky: that her work "continued to fall below expectations for accuracy and consistency with Board processes" in the four workdays since her February 20 performance evaluation.

75.     Dr. Gowesky was terminated by Mr. Smith and the Board in retaliation for filing her employment discrimination complaint against NL EMMC and NLH with the MHRC and EEOC, and for notifying NL EMMC and NLH that she was planning to file a court action against them under the Maine Human Rights Act (MHRA), the Maine Whistleblowers' Protection Act (MWPA), Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967 (ADEA) (collectively "employment civil rights laws"). Dr. Gowesky's retaliatory termination was triggered by the

series of communications from NLH beginning on January 15, 2020, condemning her for engaging in these activities protected under employment civil rights laws.

76.    Dr. Gowesky was also terminated at least in part because of herprotected whistleblower activity under the MWPA, namely, pursuing her rights as a State employee through her union.

77.    Mr. Smith acted with reckless disregard for Dr. Gowesky's federally protected rights under the First Amendment and the Fourteenth Amendment, including her right to pursue her civil right claims against EMMC and NLH and her right to associate with her union, when he unlawfully retaliated against Dr. Gowesky for engaging in these activities by terminating her employment with the Board.

### Exhaustion of Administrative Procedures

78.    On December 29, 2020, Dr. Gowesky filed a complaint of retaliation against Defendants under these employment civil rights laws with the Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC).

79.    The MHRC issued a Notice of Right to Sue on December 5, 2022.

80.    On February 23, 2023, Dr. Gowesky requested a notice of right to sue from the EEOC and she has an absolute right to receive that notice.

81.    Dr. Gowesky has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

### Legal Claims for Unlawful Retaliation Based on Activities Protected by Civil Rights Laws

82.    The allegations above are realleged.

83.    In violation of the anti-retaliation provisions of the MWPA, the MHRA, and Title VII, Defendants intentionally retaliated against Dr. Gowesky by terminating her because she engaged in protected activities.

84.    Defendants interfered with Dr. Gowesky's exercise and enjoyment of the rights granted and protected by the MHRA and otherwise violated the prohibitions in 5 M.R.S.A. § 4633.

85.    Acting under color of state law, Mr. Smith discriminated against and terminated Dr. Gowesky in retaliation for her exercise of the First Amendment rights to free speech and to petition the courts for redress, in violation of 42 U.S.C. § 1983. Dr. Gowesky pursued her grievances against NL EMMC and NLH as a private citizen, and they related to matters of public concern, including civil rights violations by one of Maine's largest employers and serious risks to patient safety at the second largest hospital emergency room in Maine. Dr. Gowesky also engaged in protected First Amendment activity when she pursued her rights as a State employee through her union.

21

86.     Dr. Gowesky is pursuing all possible methods of proving discrimination and retaliation, including but not limited to, circumstantial and direct evidence, pretext evidence, implicit or unconscious bias, as well as causation based on a determining factor even though other, non-discriminatory factors were determining factors.

87.     Dr. Gowesky is not pursuing any claims under 42 U.S.C § 1983 against Defendant State of Maine but only against Defendant Smith. Dr. Gowesky is not pursuing any claims under Title VII or the ADEA against Mr. Smith but only against Defendant State of Maine. As a direct and proximate result of Defendants' intentional discrimination and retaliation, Dr. Gowesky has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of her job and of her life, injury to reputation, and other pecuniary and non-pecuniary losses.

## Request for Relief

88.     Thus, Plaintiff requests relief against Defendants as follows:

(a)     Enter declaratory relief that Defendants, as alleged above, violated Dr. Gowesky's statutory civil rights to be free from unlawful retaliation, and that Mr. Smith violated Dr. Gowesky's constitutional rights

to be free from retaliation for exercising her rights under the First and Fourteenth Amendments;

(b)     Enter injunctive relief ordering the State of Maine, Maine Board of Licensure to:

(i) reinstate Dr. Gowesky to her prior position with all benefits and privileges as if her employment had never been terminated, or, if that remedy is not available, front pay;

(ii) provide effective civil rights training for all its employees with supervisory or management duties on the requirements of all applicable laws prohibiting employment discrimination because of an employee's protected activity under all applicable employment civil rights laws and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

(iii) provide this training for two years after the date judgment is entered to all new human resources and supervisory employees within 60 days of their starting the position;

(iv) maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

(v) post at the worksite a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief; and

(vi) send a letter printed on the Maine Board of Licensure's

letterhead to all its employees advising them of the judgment in this case, enclosing a copy of their policies regarding anti-discrimination and retaliation, and stating that they will not tolerate any such discrimination or retaliation, and will take appropriate disciplinary action against any employee or agent of the Board who engages in such discrimination.

(c)      Award back pay for lost wages and benefits;

(d)      Award as liquidated damages an amount equal to twice the amount of unpaid wages and benefits;

(e)      Award compensatory damages in amounts to be determined at trial by the jury or nominal damages;

(f)      Award punitive damages against Mr. Smith in amounts to be determined at trial by the jury;

(g)      Award Plaintiff full costs and reasonable attorney's fees;

(h)      Award pre-judgment interest; and

(i)      Award all further relief that is appropriate.

Respectfully submitted,

Date: March 2, 2023

David G. Webbert, Bar No. 7334
Johnson & Webbert, LLP
1 Bowdoin Island Mill, Ste. 300
Topsham, Maine 04086
Tel: (207) 623-5110
dwebbert@work.law

24

*Attorney for Plaintiff Brenda A.
Gowesky*

Sarah K. Austin, Bar No. 6375
Johnson & Webbert, LLP
1 Bowdoin Island Mill, Ste. 300
Topsham, Maine 04086
Tel:  (207) 623-5110
saustin@work.law

*Attorney for Plaintiff Brenda A.
Gowesky*

25